COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Annunziata and Agee
Argued at Alexandria, Virginia


AVALON ASSISTED LIVING FACILITIES, INC.,
 D/B/A AVALON HOMES


v.    Record No. 0778-02-4

ZOFIA A. ZAGER, FAIRFAX COUNTY
 BUILDING OFFICIAL, AND DIRECTOR,
 FAIRFAX COUNTY OFFICE OF
 BUILDING CODE SERVICES                           OPINION BY
                                          JUDGE LARRY G. ELDER
STATE BUILDING CODE TECHNICAL                DECEMBER 31, 2002
 REVIEW BOARD


v.    Record No. 0820-02-4

ZOFIA A. ZAGER, FAIRFAX COUNTY
 BUILDING OFFICIAL, AND DIRECTOR,
 FAIRFAX COUNTY OFFICE OF
 BUILDING CODE SERVICES


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                   Leslie M. Alden, Judge

          Andrew D. Levy (Sharon Krevor-Weisbaum;
          Shelly Marie Martin; Mark E. Sharp; Brown,
          Goldstein & Levy, LLP; Culin, Sharp & Autry,
          P.L.C., on briefs), for Avalon Assisted
          Living Facilities, Inc.

          Jennifer C. Williamson, Assistant Attorney
          General (Jerry W. Kilgore, Attorney General;
          Richard B. Zorn, Senior Assistant Attorney
          General; John B. Purcell, Jr., Assistant
          Attorney General, on briefs) for State
          Building Code Technical Review Board.

          Cynthia A. Bailey, Assistant County Attorney
          (David P. Bobzien, County Attorney; J.
          Patrick Taves, Deputy County Attorney;
          Jan L. Brodie, Senior Assistant County
          Attorney, on briefs), for appellee.

Avalon Assisted Living Facilities, Inc., d/b/a Avalon Homes (Avalon), and the State Building Code Technical Review Board (TRB) appeal from a decision of the Fairfax County Circuit Court holding that the TRB erroneously applied the Uniform Statewide Building Code (USBC) to Avalon's request to allow it to depart from the USBC's use group classifications.[1]  On appeal, Avalon and the TRB contend the TRB had the authority to grant the requested modification and that the evidence in the record supported its decision to do so.  We affirm the circuit court's conclusion that the TRB lacked authority to modify the USBC's use group classifications.  Further, we hold, as a matter of law, that Avalon's facility constituted an I-2 use.  Finally, we conclude that any modifications to the provisions of the USBC covering the manner of construction or materials to be used in the alteration of Avalon's facility to comply with the I-2 use group standards must be the functional equivalent of those expressly required by the USBC.  Thus, we affirm in part, reverse in part, and remand to the circuit court with instructions to remand to the TRB to determine whether the alterations it approved were, in fact, the functional equivalent of those required by the USBC for a facility housing an I-2 use group.

---

[1] Although these appeals have been assigned separate case numbers, they arise out of the same proceedings and involve similar assignments of error.  Thus, we consolidate them for purposes of appeal.

# I.

## BACKGROUND

This appeal stems from a request by Avalon for classification of its facility under the USBC as a residential use group rather than an institutional use group in order to avoid having to meet certain USBC fire safety standards which Avalon alleged were cost-prohibitive. Avalon proposed adding certain lesser protections, which included central station monitoring and a sprinkler system in all compartments except the attic, in exchange for the requested modification of its USBC use group classification. The local building code official (the local official), Zofia A. Zager, after consulting with her advisory committee, denied the request. The local official wrote, "This denial is based on the fact that your proposal for an R-4 use does not provide the occupants the same level of protection as that which is required by the [USBC] for an I-2 use."

Avalon appealed to the local board of building code appeals (the local appeals board). After hearing statements from representatives of Avalon and the local official, the local appeals board granted the modification request. It concluded the additional safeguards Avalon proposed, coupled with added safeguards including the installation of heat rise detectors in the attic space and "smoke tight" doors and partitions separating the corridor from the sleeping rooms, "[were]

sufficient to balance the omission of the fire protection requirements of structural components otherwise required by the [USBC]."

The local official appealed to the TRB, which affirmed the decision of the local appeals board.  The TRB, in making its decision, had before it the record of the proceedings from the local appeals board.  It also swore witnesses and heard additional evidence.  The record included evidence of the following:

In a single-family residence in McLean, Virginia, Avalon operates an adult care residence (ACR), see 22 Va. Admin. Reg. 40-71-10, which is licensed by the Department of Social Services (DSS) to house up to eight residents.[2]  Avalon provides care

_____

[2] DSS regulations define "Adult care residence" as follows:

> any place, establishment or institution,
> public or private, operated or maintained
> for the maintenance or care of four or more
> adults who are aged, infirm or disabled and
> who are cared for in a primarily residential
> setting, except (i) a facility or portion of
> a facility licensed by the State Board of
> Health or the Department of Mental Health,
> Mental Retardation and Substance Abuse
> Services, but including any portion of such
> facility not so licensed; (ii) the home
> residence of an individual who cares for or
> maintains only persons related to him by
> blood or marriage; and (iii) a facility or
> portion of a facility serving infirm or
> disabled persons between the ages of 18 and
> 21, or 22 if enrolled in an educational
> program for the handicapped . . . .

22 Va. Admin. Code 40-71-10.

primarily for elderly women suffering from Alzheimer's disease and the mental and physical ailments which accompany it. The 2,700-square-foot residence has been converted to house a maximum of eight patients and two full-time staff people.

The purpose of Avalon's McLean ACR is to provide Alzheimer's patients with continuity of care, allowing them to "stay there through until the end, and sometimes have hospice come in when people are at the end-stages of their illness." Avalon's residents are usually "ambulatory from the standpoint that they can walk," although some are wheelchair bound and require physical assistance. However, because the residents are cognitively confused, in the event of an emergency, some of the residents who can walk nevertheless may need to be led out by the hand. Also, due to the fact that Alzheimer's patients "go through . . . peaks and valleys," the number of residents able to respond with help could vary from day to day. In the event of an emergency requiring evacuation, any patients physically incapable of walking would be carried out on their bed sheets. The facility conducts monthly fire drills, and "usually the longest it takes . . . is five, six minutes to get all eight people out," provided none of the occupants are bedridden.

Although Avalon was licensed by DSS for up to eight residents at a time, local officials had interpreted the USBC to allow operation of the ACR under the requirements for a residential use group as long as no more than five of those

eight residents were non-ambulatory, i.e., needed assistance to evacuate.  Avalon was concerned that this restriction had the potential to force relocation of a resident if her condition deteriorated such that she became the sixth non-ambulatory resident at the ACR.  Avalon represented that it would limit to five the number of residents who were bedridden or otherwise physically unable to evacuate.  It sought a USBC waiver so that it could have up to eight residents unable to evacuate independently due to psychological limitations, such as those residents who were physically able to evacuate if led by the hand.

Avalon hired Mark P. Dempsey, a fire protection engineer, to investigate upgrading the ACR to meet the I-2 use group requirements but concluded such upgrades would be cost-prohibitive.  Avalon then proposed to add certain lesser safety protections in exchange for being allowed to continue to be classified as a residential rather than institutional use even with more than five non-ambulatory residents.  Those protections included (1) installation of (a) an automatic sprinkler system for all areas of the residence except the attic, (b) smoke detectors and (c) a manual fire alarm system connected to both the sprinkler system and an approved central station for monitoring; and (2) placement of any non-ambulatory residents in bedrooms located on the grade level.  Ordinarily, an ACR with a residential use group classification is required

to have only single station smoke detectors.  See Code
§ 36-99.5:1.  Dempsey concluded that the additional fire
protections he outlined were "at least equivalent in protection
to those required by the I-2 standard."

Representatives of the local official noted their "group
unanimously . . . came to the conclusion that the differences
[between the fire safety requirements for a structure housing an
I-2 use group and the protections which Avalon proposed adding]
were far too great" and that "[i]t was beyond [the local
official's] authority to grant this modification."

The local official continued to object on the ground that
Avalon's plan included no "passive fire protection whatsoever."
She emphasized that Avalon's facility is Type 5-B construction,
which "has zero fire ratings on . . . its structural
components."  An I-2 use group must be Type 5-A construction,
which "requires a minimum of one-hour fire rating on major
structural components to make sure that the building does not
collapse" during the time it takes the fire department to
respond.

After considering the evidence and argument, the TRB
granted Avalon's modification request.  In doing so, however, it
noted

> two areas of concern in the wording of the
> USBC and its application to ACR's.  First,
> the inclusion of group homes licensed by
> [DSS] in the exception to § 308.2 should not
> include the statement that such facilities

> house mentally ill, mentally retarded or
> developmentally disabled persons[,] as ACR's
> by statutory and regulatory definition are
> for persons who are aged, infirm or
> disabled.  Notwithstanding the incorrect
> language, the [TRB] determines the intent of
> the USBC is for the exception to apply to
> ACR's.  Secondly, the determination that
> § 308.2 and its exception permit up to five
> residents [out of eight] at any given time
> to be unable to exit the residence without
> personal assistance from staff does not
> match the explicit language of the code.
> Recognizing however that this has been a
> long-standing application of the code and is
> supported by an interpretation issued by the
> BOCA Code Interpretations Committee, the
> [TRB] agrees § 308.2 and its exception may
> be applied as stated in this case.

The TRB expressly recommended the Housing Board amend the USBC
to address these inconsistencies.

In support of its decision to grant Avalon's requested
modification, the TRB relied on four findings.  First, it found
that allowing Avalon to house eight residents of varying degrees
of awareness after equipping its facility with the proposed
safety features was an improvement over the situation permitted
by the code, which could involve housing five residents totally
incapable of exiting in a building with no fire protections
whatsoever.  Second, it observed that other facilities with the
same number and type of residents with equivalent fire safety
construction and features presumably are being approved in other
states, under the Life Safety Code, another nationally
recognized safety standard.  Third, it noted that the USBC use
group definitions do not distinguish between licensed and

unlicensed facilities and the terms of Avalon's DSS license provide additional safeguards and restrictions on Avalon's use of its ACR, including the restriction that it shall not admit or retain individuals requiring continuous licensed nursing care. Finally, it found that Avalon's facility is not "an exact match" for Use Group I-2, "shares most of the characteristics of a Use Group I-1 facility," and "nearly qualifies for the residential exception to the Use Group I-1 classification without any added safety features."  As a result, it concluded that the requested modification preserved the spirit and intent of the USBC and assured the public health, welfare and safety.

The TRB did not expressly address the meaning of the I-1 requirement that the residents be "physically capable of responding to an emergency situation without personal assistance."  However, the conclusion that this phrase includes those physically but not cognitively able to exit on their own appears to be implicit in its determination that Avalon "shares most of the characteristics of a Use Group I-1 facility" and "nearly qualifies" for the residential exception.

The local official appealed the decision of the TRB to the Fairfax County Circuit Court under the APA.  The circuit court observed as follows:

> [M]y concern about the TRB is not in their
> determination that this fire safety
> provision is substantially equivalent to
> that which is required in the I-2
> category. . . .  [I]n my view, that's what

the TRB is there to do, make those technical construction type determinations. . . .  My concern is that they're now making the determination that given the adequacy of this system, well, it makes sense to allow three more patients there.

       *       *       *       *       *       *       *

[G]iving all due deference to the correctness of administrative decisions, today I conclude the [TRB] must be reversed and Avalon's request denied . . . .

Now, I think the difference between the I-1 and I-2 use groups, as set out in the BOCA Code, is clearly that in the I-1 category the residents must not require personal assistance to be evacuated.  And I refer at least in part in that determination on looking at the definition in [Code § ] 63.1-174.1, and I think with . . . the aid of that statute, the construction in the BOCA Code is clear.

Now, the [TRB] has the authority to determine whether a facility is in the I-1 category or in the I-2 category, and it also has the authority to determine whether the technical requirements of those categories had been met, but the review board does not have the authority, under the guise of making a modification to BOCA Code, to create what was essentially a new use group or an exception to the substantive requirements of one or another use group, and I think that's what the TRB has done here.

By the TRB's own wording, they said, well, Avalon is mostly an I-1, but kind of an I-2, and the TRB has declined to put the facility in one category or the other.  And what the TRB has clearly done is created another category and tried to call it a modification.

Now, the TRB has determined that the facility is compliant with the I-1, R-4 category, but that simply is belied by the

record, because the record clearly establishes that there are persons in the facility who need personal assistance to be evacuated.

And what the TRB has tried to do is to create the same kind of exception to the I-2 category that the Housing and Community Development Department created in the I-1 category, and this is an act that the TRB simply has no authority to do.

And I think the TRB has really recognized that itself, that it's waded into the legislative waters under the guise of [a modification] in this case, because the TRB has recognized that what its correct role is, I think in this case, is to recommend to the Housing and Community Development Department that some legislative change be made to these use groups. And the TRB is probably absolutely right that some legislative change ought to be made to these use groups.

I think the TRB made a very practical decision, I understand why they did what they did; I just don't think they have the legal authority to do that.

II.

STATUTORY AND REGULATORY FRAMEWORK

The legislature has created the Board of Housing and Community Development (the Housing Board) and directed it to adopt a Uniform Statewide Building Code (USBC). Code §§ 36-98, 36-131, 36-135. As described by the legislature,

> The provisions [of the USBC] shall be such as to protect the health, safety and welfare of the residents of this Commonwealth, provided that buildings and structures should be permitted to be constructed at the least possible cost consistent with recognized standards of health, safety,

- 11 -

energy conservation and water conservation and barrier-free provisions for the physically handicapped and aged.

Code § 36-99(A). The legislature also has directed that, "[i]n formulating the [USBC] provisions, the [Housing] Board shall have due regard for generally accepted standards as recommended by nationally recognized organizations, including . . . the Building Officials Conference of America [BOCA] . . . ." Code § 36-99(B). Finally, the legislature has provided that "[t]he [Housing] Board may modify, amend or repeal any [USBC] provisions from time to time as the public interest requires, after notice and hearing," Code § 36-102, and "in accordance with the Administrative Process Act [(APA)]," Code § 36-100.

The legislature has delegated responsibility for "[e]nforcement of the [USBC] [to] . . . the local building department," Code § 36-105, which is defined as "the agency or agencies of any local governing body charged with the administration, supervision or enforcement of the [USBC] and regulations," Code § 36-97. Within each local building department, "[t]here shall be established . . . a local board of Building Code Appeals" or other designated body (the local appeals board). Code § 36-105. The legislature has provided that a party not satisfied with the local department's decision "concerning application of the [USBC] or [the local department's] refusal to grant a modification to the provisions of the [USBC] covering the manner of construction or materials

- 12 -

to be used in the erection, alteration or repair of a building or structure" may appeal to the local appeals board.  Id.  A party dissatisfied with the decision of the local appeals board may appeal to the TRB under the provisions of the APA.  Code §§ 36-105, 36-114.

The Housing Board, pursuant to the legislature's delegation of authority, has promulgated a USBC.[3]  In doing so, the Board incorporated by reference the majority of the BOCA National Building Code of 1996 (BNBC).[4]  USBC § 104.1, 13 Va. Admin. Code 5-61-25(A).  The USBC provides that the local "building code official [(the local official)] shall enforce the provisions of the USBC as provided herein, and as interpreted by the [TRB]."  USBC § 107.1, 13 Va. Admin. Code 5-61-41.  The USBC also purports to give the local official the authority to "grant modification to any of the provisions of the USBC, provided the spirit and intent of the USBC are observed and public health, welfare and safety are assured."  USBC § 107.2, 13 Va. Admin. Code 5-61-41 (emphasis added).

---

[3] The Housing Board was first authorized to promulgate a USBC in 1972.  See 1972 Va. Acts, ch. 829.  It has enacted revised versions of the USBC periodically since that time. Except where otherwise noted, all references to the USBC herein are to the version applicable to the present proceedings, which took effect on September 15, 2000.  See 13 Va. Admin. Code 5-61-25 (historical notes).

[4] All references herein to the BNBC are to the 1996 edition except where otherwise noted.

The USBC classifies all structures "in one or more . . . use groups" with respect to the number of occupants and manner of occupancy.  BNBC § 302.1.  Among the ten use groups are four categories of residential use groups (groups R-1 to R-4) and three categories of institutional use groups (groups I-1 to I-3).  Id.  The USBC provides that "[a]ll structures shall be classified with respect to occupancy in one or more of the [listed] use groups" and that "[w]here a structure is proposed for a purpose which is not specifically provided for in this code, such structure shall be classified in the use group which the occupancy most nearly resembles."  Id.

A structure's use group classification determines which set of USBC safety standards that structure must meet.  For example, fire safety standards for structures occupied by residential use groups are more lenient than those for structures occupied by institutional use groups.  See generally BNBC, chs. 6, 7, 9.

The USBC defines institutional use groups as follows:

> Section 308.0 INSTITUTIONAL USE GROUPS
>
> 308.1 General:  All structures in which people suffering from physical limitations because of health or age are harbored for medical or other care or treatment, or in which people are detained for penal or correction purposes, or in which the liberty of the inmates is restricted, shall be classified as Use Group I-1, I-2 or I-3. the term "Use Group 1" shall include Use Groups I-1, I-2 and I-3.
>
> 308.2 Use Group I-1:  This use group shall include buildings and structures which house

- 14 -

six or more individuals who, because of age, mental disability or other reasons, must live in a supervised environment but who are physically capable of responding to an emergency situation without personal assistance. Where accommodating persons of the above description, the following types of facilities shall be classified as I-1 facilities: board and care facilities, half-way houses, group homes, social rehabilitation facilities, alcohol and drug centers and convalescent facilities. A facility such as the above with five or [fewer] occupants shall be classified as a residential use group.

Exception: Group homes licensed by the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services or the Virginia Department of Social Services which house no more than eight mentally ill, mentally retarded or developmentally disabled persons with one or more resident counselors shall be classified as [Residential] Use Group R-3 or R-4.

308.3 Use Group I-2: This use group shall include buildings and structures used for medical, surgical, psychiatric, nursing or custodial care on a 24-hour basis of six or more persons who are not capable of self-preservation. Where accommodating persons of the above description, the following types of facilities shall be classified as I-2 facilities: hospitals, nursing homes (both intermediate care facilities and skilled nursing facilities), mental hospitals and detoxification facilities. A facility such as the above with five or [fewer] occupants shall be classified as a residential use group.

308.3.1 Child care facility: A child care facility which accommodates more than five children 2 1/2 years of age or less for any length of time shall be classified as a Use Group I-2.

- 15 -

> 308.4 Use Group I-3: This use group shall
> include buildings and structures which are
> inhabited by six or more persons who are
> under some restraint or security . . .
> [including] prisons, jails, reformatories,
> detention centers, correctional centers and
> prerelease centers. . . .

BNBC § 308 (emphases added); USBC § 104.1, 13 Va. Admin. Code 5-61-25 (adopting BNBC); 13 Va. Admin. Code 5-61-210 (adding exception to § 308.2).

### III.

### ANALYSIS

On appeal of an agency decision, "the sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). In making this determination, "the reviewing court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Id.

On appeal of an agency's determination on issues of law, the standards differ. "'If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have special competence, i.e., the common law or constitutional law,'" the court need not defer to the agency's

- 16 -

interpretation.  Id. at 243-44, 369 S.E.2d at 8 (quoting

Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir.

1981)).

> However, where the question involves an
> interpretation which is within the
> specialized competence of the agency and the
> agency has been entrusted with wide
> discretion by the General Assembly, the
> agency's decision is entitled to special
> weight in the courts[, and] . . . "'judicial
> interference is permissible only for relief
> against the arbitrary or capricious action
> that constitutes a clear abuse of delegated
> discretion.'"

Id. at 244, 369 S.E.2d at 8 (quoting Va. Alcoholic Beverage

Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257

S.E.2d 851, 855 (1979) (quoting Schmidt v. Bd. of Adjustment,

88 A.2d 607, 615-16 (N.J. 1952))).

The outcome of this appeal turns, in the first instance, on

the scope of the modification authority granted under the USBC

and its enabling legislation.  This is a legal question

involving an interpretation of both regulations and statutes.

A.

AUTHORITY TO MODIFY USBC'S USE GROUP CLASSIFICATIONS

The regulations at issue give the local official--and,

indirectly via the right of appeal, the local board and the

TRB--the authority to "grant modification to any of the

provisions of the USBC, provided the spirit and intent of the

USBC are observed and public health, welfare and safety are

assured."  USBC § 107.1, 13 Va. Admin. Code 5-61-41 (emphasis

added); see Code §§ 36-105, 36-114.  The BNBC, by contrast, originally limited the local official to modifications of the "structural or mechanical provisions of [the BNBC]."  BNBC § 107.1 (1987 ed.); see also BNBC § 107.1 (1996 ed.) (deleting "structural or mechanical" language).  We assume without deciding that the Housing Board, in deviating from the language of the BNBC, intended to permit modification of any of the USBC's provisions, not just its structural or mechanical provision.  Nevertheless, the authority of the Housing Board to permit modification is limited to that granted by the General Assembly in the enabling legislation, see Code § 36-105, which implicitly allows modifications only to USBC provisions governing "the manner of construction or materials."  See, e.g., Brown v. United Airlines, Inc., 34 Va. App. 273, 276, 540 S.E.2d 521, 522 (2001) (noting legislative enactment which delegates to agency authority to adopt rules and regulations for carrying out enactment does not permit adoption of inconsistent rules or regulations).

The related statutory scheme does not expressly grant any power to the local official to modify the USBC's provisions.  It expressly grants such power only to the Housing Board, which "may modify, amend or repeal any [USBC] provisions . . . after notice and hearing" and "in accordance with the [APA]."  Code §§ 36-100, 36-102.  However, the legislature expressed its intent in Code § 36-105, which provides that a party not

satisfied with the local official's decision "concerning application of the [USBC] or [the local official's] refusal to grant a modification to the provisions of the [USBC] covering the manner of construction or materials to be used in the erection, alteration or repair of a building or structure" may appeal to the local appeals board.  In the absence of other statutory language permitting the local official to grant a modification of the USBC, we hold the legislature contemplated the local official would have authority "to grant a modification" only to "the provisions of the [USBC] covering the manner of construction or materials to be used in the erection, alteration or repair of a building or structure," as listed in Code § 36-105.

To the extent the Housing Board purported to authorize the local official--and the local appeals board and TRB via the appeals process--to grant modification to any of the provisions of the USBC, that regulation exceeds the Housing Board's statutory authority and constitutes a clear abuse of delegated discretion.  The only modifications permitted are those involving "the manner of construction or materials to be used in the erection, alteration or repair of a building or structure." Code § 36-105.  Thus, we affirm the circuit court's ruling that the TRB lacked authority to create a new use group or to classify Avalon in a use group the definition of which it did

- 19 -

not meet because those modifications do not directly involve "the manner of construction or materials to be used."

B.

PROPER CLASSIFICATION OF AVALON UNDER
EXISTING USBC USE GROUP DEFINITIONS

We also affirm the circuit court's ruling that Avalon's facility constitutes an I-2 use. This classification requires an interpretation of regulations which fall "within the specialized competence" of the local official and local appeals board. Although the TRB has the authority on appeal to classify a particular structure in its proper use group, the TRB hears appeals from decisions arising under the USBC, the Fire Prevention Code and various other state construction safety laws. See Code § 36-114. As the circuit court observed, the TRB's job is to make "technical construction type determinations," such as whether the fire safety features proposed by Avalon would be "substantially equivalent to that which is required" by a facility in Avalon's use group. The TRB's specialized competence does not extend to interpreting the USBC's various use group definitions, and we need not defer to the TRB in that regard.

Both the local official and the local appeals board concluded that Avalon's facility constituted an I-2 use. Relying in part on rules applicable to the construction of statutes, we agree. "In construing statutes, courts are charged

with ascertaining and giving effect to the intent of the legislature." Crown Cent. Petroleum Corp. v. Hill, 254 Va. 88, 91, 488 S.E.2d 345, 346 (1997). "That intention is initially found in the words of the statute itself, and if those words are clear and unambiguous, we do not rely on rules of statutory construction or parol evidence, unless a literal application would produce a meaningless or absurd result." Id. We must "avoid interpreting each word [in a statute] in a way that makes it repetitious of another." Germek v. Germek, 34 Va. App. 1, 8, 537 S.E.2d 596, 600 (2000). Further, statutes on the same subject matter, i.e., those standing in pari materia, must be considered together and harmonized if possible. Lambert v. Barrett, 115 Va. 136, 141, 78 S.E. 586, 587 (1913). We see no reason not to apply these same rules to the interpretation of regulations adopted by an administrative agency pursuant to statutory authority granted it by the legislature.

Applying these principles, we hold that Avalon must be classified as an I-2 facility rather than an I-1 facility or a residential facility pursuant to Virginia's I-1 exception. In order to be eligible for classification under the I-1 use group designation or its residential exception, a facility must house individuals "who are physically capable of responding to an emergency situation without personal assistance." BNBC § 308.2. Avalon urges us to interpret the subject language, "physically capable of responding to an emergency situation without personal

- 21 -

assistance," as distinguishing a resident's physical ability to evacuate from her cognitive or psychological ability to do so. Under the principles of construction above, however, we conclude this interpretation would lead to an absurd result. The interpretation to be given the phrase, "physically capable of responding," manifestly must be governed by the subsequent phrase, "without personal assistance." A resident who is physically capable of moving her body without assistance but who is cognitively unable to recognize the need to do so when warned by an external source such as a fire alarm or a verbal instruction in an emergency situation is not "physically capable of responding to an emergency situation without personal assistance." (Emphasis added).

The correctness of this interpretation is further illustrated by the language defining Use Group I-2. All Institutional Use Groups I-1 and I-2 house "people suffering from physical limitations because of health or age [who are] harbored for medical care or other treatment." Use Group I-2 specifically includes those who are "not capable of self-preservation," whereas the I-1 definition covers those "physically capable of responding to an emergency situation without personal assistance." Considering these two use group definitions together, the logical conclusion is that the Housing Board intended to cover all levels of ability within these two definitions. Use Group I-2 residents are those expressly "not

capable of self-preservation," whereas I-1 residents, by inference, are those who <u>are</u> capable of self-preservation. Thus, "physically capable of responding to an emergency situation without personal assistance" means "capable of self-preservation," and Use Group I-1 residents must be both physically and mentally capable of evacuating, if necessary, "without personal assistance." The I-1 Use Group definition specifically provides that it includes "board and care facilities," "group homes" and other listed facilities <u>only</u> where those facilities "accommodat[e] persons of the above description"--those "physically capable of responding to an emergency situation without personal assistance." Thus, Avalon is not an I-1 facility simply because it is a group home; rather, how it is classified depends on the abilities of its residents.

The language in Code § 63.1-174.1,[5] which pertains to DSS's licensure of homes for "[a]ged, [i]nfirm or [d]isabled [a]dults," does not require a different result. Code § 63.1-174.1 does not constitute a legislative requirement that

_____

[5] This statute was in effect at all times relevant to these proceedings. In 2002, the legislature repealed Title 63.1 and reenacted an amended version of former Code § 63.1-174.1 as Code § 63.2-1705. The new statute refers to "[b]uildings licensed as assisted living facilities [and] adult day care centers" but continues to provide that those facilities "shall be licensed for ambulatory or nonambulatory residents or participants" and retains the definitions of ambulatory and nonambulatory which were present in former Code § 63.1-174.1.

the Housing Board conform its regulations to the statutory definitions or regulations of DSS.  Rather, it requires buildings licensed by DSS "for ambulatory or nonambulatory residents," as those terms are defined in the statute, to "meet the specifications for the proper [USBC] Use Group."  Although the legislature lists both "physical and mental impairment" in Code § 63.1-174.1 in referring to whether an individual is "capable of self-preservation," it does so only in the context of defining who is ambulatory and who is not.  In fact, the legislature's definitions of ambulatory and nonambulatory are roughly co-extensive with the interpretations of the I-1 and I-2 Use Group definitions we adopt herein.

It is true that the 1987 edition of the USBC deviated from the 1987 BNBC and defined Use Group I-1 in reference to an earlier definition of "ambulatory" contained in Code § 63.1-174.1.  However, with one exception not relevant here,[6] the 1990 edition of the USBC adopted the 1990 BNBC definition of Use Group I-1 as written, which provided that I-1 residents must be "physically capable of responding to an emergency situation without personal assistance" and contained no additional requirement that the residents be "ambulatory."  The Housing

---

[6] That exception was an earlier version of the present exception which permits certain group homes to house up to eight people rather than five while still retaining a residential use group classification.

Board has adopted that same definition in each subsequent edition of the USBC.

Prior to the Housing Board's adoption of the BNBC definition in 1990, the BOCA Interpretations Committee issued a code interpretation indicating that both physical and mental limitations must be considered in determining whether an occupant of an institutional facility is "physically capable of responding to an emergency situation without personal assistance."  BOCA Code Interp. No. 11/306/84 (Apr. 4, 1984). When the Housing Board adopted the BNBC's I-1 Use Group definition in 1990, it was charged with knowledge of BOCA's interpretation of its own uniform code and implicitly accepted it.  Cf. Weathers v. Commonwealth, 262 Va. 803, 805, 553 S.E.2d 729, 730 (2001) ("When the General Assembly acts in an area in which one of its appellate courts already has spoken, it is presumed to know the law as the court has stated it and to acquiesce therein, and if the legislature intends to countermand such appellate decision it must do so explicitly."); Clinchfield Coal Co. v. Robbins, 261 Va. 12, 18-19, 541 S.E.2d 289, 292-93 (2001) (applying same principle to legislature's knowledge of Attorney General's interpretation of statutes).  Thus, this BOCA code interpretation provides further support for the conclusion that the Housing Board intended to include both physical and mental limitations in the determination of whether residents are

"physically capable of responding to an emergency situation without personal assistance."

Even if we were to construe this phrase as Avalon urges, holding that residents with only cognitive limitations <u>are</u> "physically capable of responding to an emergency situation without personal assistance," Avalon would be ineligible for the I-1 residential use exception for the two reasons identified by the TRB.

First, Virginia's residential exception to Use Group I-1 specifically states that it applies to "Group homes licensed by . . . [DSS] which house no more than eight mentally ill, mentally retarded or developmentally disabled persons." Avalon is an ACR, and ACRs "by statutory and regulatory definition are for persons who are aged, infirm or disabled" rather than for people who are "mentally ill, mentally retarded or developmentally disabled" as required for the residential exception. Thus, Avalon's McLean ACR does not meet this criterion of the I-1 residential exception.

Second, Avalon admitted that, as a facility housing Alzheimer's patients in various stages of physical and mental decline, most of its residents would become bedridden before dying, and it sought to be classified as a residential use under the I-1 exception while still housing up to five residents who were bedridden or otherwise physically unable to evacuate. As the TRB expressly noted, "the determination that [Use Group I-1]

- 26 -

and its exception permit up to five residents [out of eight] at any given time to be unable to exit the residence without personal assistance from staff does not match the explicit language of the [USBC]."  Use Group I-1 expressly applies to facilities with six or more occupants and requires that all occupants must be "physically capable of responding to an emergency situation without personal assistance."  A facility which meets Use Group I-1's substantive criteria but has five or fewer residents remains residential.  The residential exception to the I-1 Use Group permits certain group homes which meet the substantive criteria for I-1 classification to house up to eight people, rather than five, while retaining a residential classification.  For a facility to be eligible for the residential exception, all eight occupants must be "physically capable of responding to an emergency situation without personal assistance."  Thus, even under the alternate definition of the phrase, if Avalon had even one resident with significant physical limitations due to the natural progression of Alzheimer's, Avalon would be ineligible for the I-1 residential exception.

C.

STANDARD FOR MODIFYING USBC'S
STRUCTURAL AND MECHANICAL PROVISIONS

In light of our conclusion that Avalon's facility was an I-2 use, we next consider the circumstances under which the TRB

- 27 -

had the authority to permit Avalon to deviate from the provisions of the USBC covering "the manner of construction or materials to be used in the . . . alteration or repair of a building or structure" housing an I-2 use group.  We hold that the USBC provision permitting modification where "the spirit and intent of the USBC are observed and public health, welfare and safety are assured" requires a finding that the alternate material or manner of construction is the functional equivalent of the USBC's express requirement.

When the legislature delegates authority to an administrative agency to promulgate regulations, those regulations must neither exceed the scope of the authority delegated nor be inconsistent with it.  See, e.g., Brown, 34 Va. App. at 276, 540 S.E.2d at 522.  Furthermore, "delegations of legislative power are valid only if they establish specific policies and fix definite standards to guide the official, agency, or board in the exercise of the power.  Delegations of legislative power which lack such policies and standards are unconstitutional and void."  Ames v. Town of Painter, 239 Va. 343, 349, 389 S.E.2d 702, 705 (1990).  For example, language in an enabling statute which provides merely "that the regulations be designed to protect and promote the safety and health of employees" is insufficient.  Bell v. Dorey Elec. Co., 248 Va. 378, 381, 448 S.E.2d 622, 624 (1994).  "[T]he General Assembly cannot delegate its legislative power accompanied only by such a

broad statement of general policy. . . .  [D]elegations of authority are adequately limited [only] where the terms or phrases employed have a well understood meaning and prescribe sufficient standards to guide the administrator."  Id. at 381-82, 448 S.E.2d at 624 (citations omitted).  We hold, correspondingly, that the related regulations must also contain "definite standards to guide . . . the exercise of the power." Ames, 239 Va. at 349, 389 S.E.2d at 705.

Avalon contends the USBC permits two kinds of modifications.  The type of modification permitted under USBC § 112.1 expressly requires equivalency to the terms being modified.  That section provides as follows:

> Where practical, [as required by] § 36-99 of the Code of Virginia, provisions of the USBC have been stated in terms of required level of performance, to facilitate the prompt acceptance of new building materials and methods.  The provisions of the USBC are not intended to prohibit the use of any material or method of construction not specifically prescribed by the USBC, provided any such alternative has been approved.  An alternative material or method of construction shall be approved when the code official finds that the proposed design is satisfactory and complies with the intent of the provisions of the USBC, and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed by the USBC in quality, strength, effectiveness, fireresistance, durability and safety.

USBC § 112.1, 13 Va. Admin. Code 5-61-65 (emphasis added). Avalon contends that USBC § 107.2, by contrast, requires a

- 29 -

finding that the modification preserves "the spirit and intent of the USBC" and that the "public health, welfare and safety are assured" without regard to whether the modification achieves functional equivalency.  See 13 Va. Admin. Code 5-61-41; see also USBC § 107.2.1, 13 Va. Admin. Code 5-61-41 (providing that code official considering modification under USBC § 107.2 "may require and consider a statement from a professional engineer, architect or other competent person as to the equivalency of the proposed modification").

Once again, based on the language of the enabling statutes, we disagree and hold that, regardless of the intent of the Housing Board, the legislative delegation of authority permits only modifications which are the functional equivalent of what the USBC requires.  The legislature expressly stated that the provisions of the USBC

> A.  . . . shall be such as to protect the health, safety and welfare of the residents of this Commonwealth, provided that buildings and structures should be permitted to be constructed at the least possible cost consistent with recognized standards of health [and] safety . . . .  Such regulations shall be reasonable and appropriate to the objectives of this chapter.
>
> B.  . . . .
>
> C.  Where practical, the [USBC] provisions shall be stated in terms of required level of performance, so as to facilitate the prompt acceptance of new building materials and methods.  When generally recognized standards of

> performance are not available, such
> provisions shall provide for acceptance of
> <u>materials and methods</u> whose performance has
> been found by the Board, on the basis of
> reliable test and evaluation data, presented
> by the proponent, to be <u>substantially equal
> in safety</u> to those specified.

Code § 36-99 (emphases added). In delineating the process for appealing decisions made under the USBC, the legislature specifically listed only two categories of appeals, (1) those involving "application of the [USBC]" and (2) those involving the refusal of the local official to "grant a modification to the provisions of the [USBC] covering the <u>manner of construction or materials</u> to be used in the erection, alteration or repair of a building or structure." Code § 36-105 (emphasis added). Thus, the legislative scheme authorizes the Housing Board, in promulgating the USBC, to set out the <u>minimum</u> standards for construction methods and materials, and it authorizes the Board to permit individual modifications to the USBC's provisions "covering the <u>manner of construction or materials</u> to be used in the erection, alteration or repair of a building or structure" only when the alternative "<u>materials and methods</u>" are "<u>substantially equal in safety</u> to those specified." Code §§ 36-99, 36-105 (emphases added). In order to construe USBC § 107.2 to be consistent with the authority delegated by the enabling legislation and to contain sufficiently definite standards to guide the administrator, see <u>Bell</u>, 248 Va. at 381-82, 448 S.E.2d at 624; <u>Brown</u>, 34 Va. App. at 276, 540 S.E.2d

- 31 -

at 522, we interpret its language permitting modifications which preserve "the spirit and intent of the USBC" and "assure[]" the "public health, welfare and safety" to require that any modifications approved thereunder are functionally equivalent to the USBC standards from which deviation is sought. Any modifications which are not functionally equivalent to these standards are void.

Finally, we remand to the circuit court with instructions to remand to the TRB to determine whether the modifications approved by the local appeals board, which included those proposed by Avalon as well as the additional modifications listed by the local appeals board, were the functional equivalent of what the USBC would otherwise provide.

IV.

For these reasons, we hold the TRB lacked authority to modify the USBC's use group classifications. Further, we hold, as a matter of law, that Avalon's facility constituted an I-2 use. Finally, we conclude that any modifications to the provisions of the USBC covering the manner of construction or materials to be used in the alteration of Avalon's facility had to be the functional equivalent of those expressly required by the USBC. Thus, we affirm in part, reverse in part, and remand to the circuit court with instructions to remand to the TRB to determine whether the proposed modifications were, in fact, the

functional equivalent of those required by the USBC for an I-2

use.

<u>Affirmed in part,
reversed in part
and remanded.</u>
